# 22-1086

---

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

---

**UNITED STATES OF AMERICA**

*Appellee*

*v.*

**CORY M. JOHNSON**

*Appellant*

---

On Appeal from the United States District Court
for the District of Vermont: Case No. 5:19-cr-140

---

## REPLY BRIEF FOR THE APPELLANT

---

Dennis J. Johnson, Esq.
The Law Office of Dennis J. Johnson
479 West Shore Road
South Hero, Vermont 05486
Tel. (802) 233-2007
djohnson@jpclasslaw.com

Frank J. Twarog, Esq.
Catamount Law, PLLC
2 Church Street, Suite 4G
Burlington, Vermont 05402
Tel. (802) 864-9811
frank@catamountlaw.com

# TABLE OF CONTENTS

I.   Introductory corrections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  The production charge was expressly within the Release's terms. . . . . . . 2

III. The Government is held to have knowledge of the charge as all
     information necessary to ascertain it was in its possession at the
     time of the Agreement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.  Defendant's due process rights were violated. . . . . . . . . . . . . . . . . . . . 16

V.   NCMEC acted as a Governmental Agent.  Requiring it to comply
     with the Constitution will have a limited effect on its activities. . . . . . . 19

VI.  NCMEC's and Moynihan's searches for evidence outside the
     warrant's scope were unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . 20

## TABLE OF AUTHORITIES AND ABBREVIATIONS:

*Carpenter v. United States,* 138 S. Ct. 2206 (2018). . . . . . . . . . . . . . . . . . . . . . 22

*Cuero v. Cate,* 850 F.3d 1019 ((9th Cir. 2017) . . . . . . . . .10, 11, 13, 14, 15, 18, 19

*Elbit Sys. v. Credit Suisse Group*, 842 F.2d 733 (S.D.N.Y.  2012). . . . . . . . . . .14

*Haring v. Prosise*, 462 U.S. 306 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Illinois v. Andreas,* 463 U.S. 765 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Altro*, 180 F.3d 372 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . 1, 2

*United States v. Chambers,*192 F.3d 374 (3d Cir. 1999) . . . . . . . . . . . . . . . . . 21

*United States v. Edgell*, 914 F.3d 281 (4th Cir. 2019). . . . . . . . . . . . . . . .1, 10, 11

*United States v. Feldman*, 939 F.3d 182 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . 7

*United States v. Ganias,*  824 F.3d 199 (2d Cir. 2016). . . . . . . . . . . . . . . . . . . 22

*United States v. Jacobsen,* 466 U.S. 109 (1984). . . . . . . . . . . . . . . . . . . . . . . . 21

*United States* v. *Johnson,* 2021 U.S. Dist. LEXIS 122802 (D.Vt. June 29, 2021)17

i

*United States v. Nejad,* 436 F. Supp.3d 707 (S.D.N.Y. 2020). . . . . . . . . . . . 24, 25

*United States v. Padilla*, 186 F.3d 136 (2d Cir. 1999). . . . . . . . . . . . . . . . . . . . .14

*United States v. Palladino,* 347 F.3d 29 (2d Cir. 2003). . . . . . . . . . . . . . . . . . . . . . .

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 7, 8, 9, 10, 12, 14, 15

*United States v. Ragonese*, 2022 WL 3903437 (2d. Cir. Aug. 31, 2022) . . . . . . 5, 6

*United States v. Rodriguez-Garcia*, 497 F. App'x 766 (9th Cir. 2012). . . . . . . . . .14

United *States v. Transfiguracion*, 442 F.3d 1222 (9th Cir. 2006). . . . . . . . . . . . .11

*United States v. Warren,* 8 F. 4th 444 (6th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Wilson*, 920 F.3d 155 (2d Cir. 2019) . . . . . . . . . . . . . . . . . .6, 9, 15

*Santobello v. New York*, 404 U.S. 257, 260 (1971). . . . . . . . . . . . . . . . . . . . . . . . 13

## FEDERAL STATUTES

18 U.S.C. §2252A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## FEDERAL RULES

Fed.R.Crim.Pro. 41. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

## ABBREVIATIONS

Child Pornography (CP")

Defendant's Appellate Brief ("Def.BR.")

Government's Appellate Brief ("Govt.Br.")

National Center for Missing and Exploited Children ("NCMEC")

NCMEC's Child Victim Identification Program ("CVIP")

NCMEC's Child Recognition and Identification System ("CRIS")

# I.    *Introductory corrections.*

Two recurring themes in the Government's brief should have no bearing on

the issues.  First, it repeatedly recites that Defendant obtained a below-guidelines

sentence pursuant to the 2018 Plea Agreement, implying it would be unfair to find

the production charge barred by the Release. The Release expressly encompassed

this charge. The Agreement represented compromise: the Government obtained a

conviction without trial and its risks; Defendant waived his Constitutional rights and

received a *45 month* sentence. Any Governmental regrets that the Release expressly

encompasses the charge are irrelevant.  Def.Br. 33-34: *United States v. Edgell*, 914

F.3d 281 (4th Cir. 2019):

> . . . each [party] assume[d] the risk of future changes in circumstances in light
> of which [their] bargain may prove to have been a bad one.  Just as we often
> enforce plea agreements against criminal defendants even in the face of
> subsequent, favorable changes in the law, so, too, must we enforce plea
> agreements that may later prove less advantageous than the government had
> anticipated.

*Id.* at 289.  The Government's implication is also outweighed by societal and

judicial interests in ensuring the integrity of plea agreements.  Def.Br. 39-40.

 Second, it repeatedly asserts the video shows Defendant assaulting his

daughter.  It has never been proven, and he has not admitted, that it was him or his

daughter in the video.  That is the subject of the pending State charge.  As *Haring v.*

*Prosise*, 462 U.S. 306, 103 S. Ct. 2368 (1983) held, admitting guilt does not

establish facts not litigated and decided, *Id.* at 321, and there are multiple reasons for

entering into a guilty plea. *Id.* at 318.  The cost of trial, litigating on multiple fronts and the perceived strength of appellate positions are other motivations.

## II.    *The production charge was expressly within the Release's terms.*

The Government drafted the Agreement; ambiguities must be interpreted against it; its conduct during negotiation of the Agreement was required to meet the highest standards of integrity and fairness; and it is held to "meticulous standards of performance" of the Agreement.  Def.Br. 20-21.  It is hard to envision more distinct violations of that required code of conduct than was played out throughout this case.

The Government largely fails to address Defendant's arguments and case law. The meaning of a plea agreement's terms must be determined by examining what "the reasonable understandings and expectations of the defendant" would have been in light of the Government's statements and conduct preceding the plea agreement. *United States v. Palladino,* 347 F.3d 29, 33 (2d Cir. 2003) (emphasis added); *United States v. Wilson,* 920 F.3d 155*,* 158 (2d Cir. 2019) (same).  *United States v. Altro*, 180 F.3d 372 (2d Cir. 1999), cited by the Government, is inapposite.  After pleading guilty, the defendant was subpoenaed to testify before a Grand Jury.  As there was no evidence of any written or oral statements which would have led the defendant to conclude that he was immune from being subpoenaed, the court concluded *". . . since there were no terms in the agreement to be supplemented, his subjective understanding could not be introduced." Id*. at 376 (emphasis added).  *Altro* does not establish that the Government can do whatever it wants unless expressly

prohibited from doing so or that Defendant's understanding of the terms and consequences of the Agreement is irrelevant. Unlike *Altro*, *Defendant relies on the express terms of the agreement* and identifies multiple written statements issued by the Government leading to Defendant's reasonable understandings of what those terms meant and what the likely consequences of entering into the Agreement would be.

The Agreement precluded the Government from prosecuting Defendant ". . . for **any other** criminal offenses known to the United States . . . , **relative to his** knowing possession or distribution of child pornography." A.69, ¶12a. (emphasis added). These terms expressly encompass the production charge. The definition of "any other" contradicts the court's holding that the Release only applies to *a further charge of* the specified charges. "Any other" means the Release applies to non-identified charges beyond those specified. Def.Br. 24.

The Government ignores that, though a production charge is not expressly stated as being released, it nonetheless was since the Release expressly applied to "any other" charge that is "***relative to***" "his" [clearly referring to Defendant's] possession or distribution of CP. "Relative to" means, *inter alia*, "in connection with." Def.Br. 22-23. Still unaddressed is the list of facts mandating the conclusion that the production charge was "in connection with" ("relative to") Defendant's possession of CP. Def.Br. 22. One of those, Homeland Security's admission that the CP files used to induce Defendant to plead to possession were

3

"related to" the production charge dispositively confirms the production charge was barred since "related to" is defined the same as "relative to," the term used in the Release.

That production involves different conduct than possessing or sharing CP online and the terms of the possession and production statutes differ, A.18, does not demonstrate that the production charge was not "*relative to*" or "in connection with" Defendant's possession of CP. Def.Br. 23-24. In fact, the Government's 6/30/2020 brief admitted that possessing a video one produces "constitute[s]" possession. Dkt. 29: 18, ftnt. 4.

The court's analysis was premised on a flawed reading of the Release, ignoring the word "his" and its import. Def.Br. 23-24. Its comparison of the terms of the possession and production statutes was premised on its inaccurate conclusion that the Release stated "relative to knowing possession or distribution [of CP]." A.18. The Release, however, mandates a comparison of the new offense to *Defendant's conduct,* as it releases 'any other' offense "...relative to **his** [clearly meaning Defendant's] knowing possession or distribution of CP." *Id.* The charge was released as it was, *inter alia*, "in connection with," "relevant to" or "concerned" *Defendant's possession of this CP file.* The facts listed at Def'sBr. 22 confirm that it was. Homeland Security admitted it was. *Id.*

While the Release does not expressly state that it covers "other crimes related to the sexual exploitation of children," *the Release turns on what it does say*. The

definitions of "any other" and "relative to" and the import of "his" confirm that a production charge premised on one of the files used to induce Defendant to plead guilty to possession necessarily is "in connection with" Defendant's possession of that file and was therefore released.

"*[A]ny other*"; "*relative to*"; and "*his*" are all express terms of the Release, requiring them to be applied and considered in determining what Defendant's reasonable understanding of the Release would have been, given the Government's statements. Using the dictionary definitions to do so was entirely reasonable. *See United States v. Warren,* 8 F. 4th 444, 450-51 (6th Cir. 2021) (holding the dictionary definitions of "suggest" and "suggest in any way" dictated the scope of the agreement and confirmed the government's plea breach, "strictly" holding the government to its "broad promise"). The Release could have read: "the Government agrees not to prosecute Defendant for *any further charges of* possession or distribution of CP." **It does not, however, say this.** Ignoring the definitions of the Release's terms to interpret it as if it does ignores, rather than follows, "the reasonable understandings and expectations of the defendant." *Palladino, supra,* 347 F.3d at 33. Def. Brief 24-25.

*United States v. Ragonese*, 2022 WL 3903437 (2d. Cir. Aug. 31, 2022) offers no support for any Governmental position. *Ragonese* held that a State conviction for attempted sodomy of an eight year old "relat[es] to" "sexual abuse of a minor" and was therefore an enhancement to the defendant's guilty plea for possession of

CP. *Id*. at \*8-9. *Ragonese* applied Congress's interpretation of the phrase "relating to" in the sentencing enhancement statute, explaining that Congress intended the enhancement to "apply not simply to state offenses that are equivalent to sexual abuse, but rather to 'any state offense that stands in some relation [to], bears upon, or is associated with [the] generic offense.'" *Id*. at \*09. Congress's expansive reading of "relating to" provides support for broadly interpreting the Release's use of the phrase "relative to," which is defined as an equivalent of "relates to." Congress's intent is consistent with the dictionary's pronouncement that "relative to" means "in connection with." Applying Congress's stated intent of the meaning of "relating to," the production charge "stands in some relation [to], bears upon, or is associated with" Defendant's possession of the CP file used to lodge it. *Id.*

## III. *The Government is held to have knowledge of the charge as all information necessary to ascertain it was in its possession at the time of the Agreement.*

Multiple appellate cases hold the Government breached plea agreements by using information discovered *after* a plea agreement because it was held to have known about the matter *prior* to the plea agreement since it possessed the information or could have acquired or discovered that or similar information beforehand, *even if it had not recognized it had the information or its significance*. Def.Br. 28-41. (herein, the "*Palladino* rule"). *Palladino* and *Wilson*, *supra*, are controlling precedent. Neither the Government nor the court cited any case holding otherwise. The Government cited *Palladino* solely for the standard of review.

This body of law reflects the rules of conduct holding the Government to meticulous standards of integrity and fairness in connection with plea agreements; acknowledges the Government's far superior power in negotiations preceding a plea agreement, during which a defendant has no actual understanding of the Government's knowledge or thought processes; and reflects that a defendant should be able to rely on the reasonable understanding of the Government's written statements preceding a plea agreement. *United States v. Feldman*, 939 F.3d 182, 186-90 (2d Cir. 2019) (government's written statements considered in determining defendant's understandings). The Government's brief fails to acknowledge, let alone analyze, the body of law determining what "known to the Government" means in plea agreements.[1] Def. Br. 28-41 discussed at length the cases interpreting what "known to the Government" means in federal plea agreements and how those cases also confirm Defendant's other legal positions.

The *Palladino* rule is consistent with the constructive knowledge concept, pursuant to which the Government is held to have knowledge of matters it "should have known" due to its awareness of "certain subsidiary facts" (such as its possession and physical review of the video) or "could have found out" (such as its possession of the video's metadata and, per the court's 10/6/2020 Opinion, was

---

[1] Its position below was as it is in this appeal: we did not know about the charge and would not have released it if we did, arguments rendered wholly irrelevant by *Palladino's* and the other appellate opinions' holdings.

completely free to access).  Courts have repeatedly concluded that "known" includes the Government's constructive knowledge. Def.Br. 29, ftnt. 1.

    *Palladino* is controlling and factually on point.  There, defendant pleaded guilty to making a threat to do physical harm over an interstate call. *Palladino*, *supra*, 347 F.3d at 31.  After the PSR noted a potential enhancement if there was evidence defendant intended to carry out the threat, the Government listened to a phone tape it had in its possession at the time of the plea agreement, but had not focused on.  *Id.*  Since the tape documented the defendant's intent to carry out the threat, the Government sought extra levels of sentencing.  This Court focused on whether the information used to seek the enhancement was "known to" the Government at the time of the agreement. *Id.* at 32.   As the tape was in the Government's possession, the Court found the basis for the enhancement was known to it at the time of the plea agreement *even though it only listened to the tape and realized its import after the agreement*.  *Id.*  Reiterating its obligation to "follow the reasonable understandings and expectations of the defendant . . . ," the Court held the defendant would have reasonably concluded that the Government would only seek an adjustment if it later acquired "new" information, that is, *information not already in its possession.  Id.*  As it had the tape prior to the agreement, its content was held not to be "new" and the Government was held to have known of it, even though it did not have actual knowledge of the tape's contents.  *Id.* at 32.

The court held *Palladino* inapposite because the GPS information supplied by
NCMEC from the video's metadata was "new" even though *Palladino* makes clear
that "new" does not mean newly realized, as the court interpreted the term, but
rather means not in the Government's possession at the time of the plea agreement,
whether or not the Government had appreciated that it had it or its significance. *Id.*
at 32, 34. In *Palladino,* the PSR prompted a further analysis of information in the
Government's possession when the plea was entered: an audio tape. Here, NCMEC
prompted a further analysis of information in the Government's possession when the
plea was entered: the GPS in the video's metadata. The facts of the two cases are
directly on point with each other. In fact, here, the video was viewed and identified
as contraband providing the Government even more information than in *Palladino*.
*Palladino* confirms that the Government's efforts to argue it was not aware of the
metadata's content are irrelevant. Even if it was not aware of the metadata's
content, the Government is held to have known about it because it was in its
possession. Undermining any contrary conclusion, its appellate position is that the
file and metadata are one in the same.

Palladino also demonstrates the fallacy of the court's assertion that Defendant
argued "that the Government agreed not to file new charges on the basis of new
information." A.23, Govt. Br. 33. The words "new" in that sentence have two
different meanings. The production charge certainly was "new" in the traditional
sense. It changed Defendant's "exposure so dramatically" it would not have been

9

reasonably foreseen as a risk of the Agreement. *United States v. Wilson*, 920 F.3d 155, 165 (2d Cir. 2019). *See infra* (due process section). This conclusion is buttressed by the Government's statements of search prowess, the Report's stated application of that search prowess, its decision not to file additional charges as a result of its review and, critically, the Agreement was a charge bargain agreement:

> *The foundation of a charge bargain is that the parties reach an agreement as to what the prosecution will and will not charge and to what the defendant will plead. By definition, a charge bargain means that the prosecution will not later add charges or strikes, just as the defendant will not plead to less than the agreed-upon charges and strikes. The government's attempt to amend the complaint unequivocally breached its central promise to Cuero.*

*Cuero v. Cate,* 850 F.3d 1019, 1024 ((9th Cir. 2017). (emphasis added). The Government's statements also led to the reasonable conclusion that, given its stated expertise, the Government would have been aware of "any other" charge "in connection with" the CP files and was waiving it in exchange for Defendant's entry into the Agreement. The Release expressly said this was the case.

On the other hand, the information here was no more "new" than was the contents of the audio tape in *Palladino*. In both instances, the Government possessed the information at the time of the plea agreement and is therefore held to have knowledge of it, even though, in both instances, it was not aware of the information or had not recognized its significance. *See also United States v. Edgell*, 914 F.3d 281 (4th Cir. 2019), holding the Government breached the plea agreement by attempting to use a post-plea lab analysis of the drug involved in the charge

because the drug was in the Government's possession at the time of the plea and
"[t]he government's apparent misjudgment about the importance of the lab report is
not grounds for relieving the government of its obligations under the plea
agreement." *Id.* at 289. Def.Br. 33-34. Just as the Government assumed the risk of
what the subsequent *Edgell* lab analysis would reveal, the Government assumed the
risk that a subsequent NCMEC analysis might reveal additional information. *Id.* If
the Government wanted the right to have NCMEC later search the files and use
information revealed in that search, it was required to reserve that right. See *Cuero,
supra,* 850 F.3d at 1025 ("If the prosecution is troubled by its inability to breach a
binding plea agreement if further information about a defendant's criminal history
comes to light, contractual provisions can and do minimize that risk."); *United
States v. Transfiguracion*, 442 F.3d 1222, 1232 (9th Cir. 2006) (The Government, "
the drafter of the plea agreement could have anticipated the contingency that has
arisen and included a provision protecting the government's interest . . . It is the
government, not an individual criminal defendant, who is the repeat player in the
plea bargaining process."). Def.Br. 35-36. The Agreement did not contain such a
reservation of rights. Neither the Government nor court cited any case holding the
Government remains free to conduct further searches of the files used to induce a
defendant to plead guilty, let alone in a charge bargain case for evidence of a
different charge. Doing so was fundamentally contradictory to the essence of the
charge bargain agreement.

The Government asserts Defendant, referencing the PSR, argued that the Government's position at the 2019 sentencing "proves the government was aware of Defendant's production of [CP] at the time of the original plea." Gov. Br. 33.  In the case, Defendant cited the PSR, first, because it confirmed Defendant's reasonable understanding that the Government had thoroughly searched the CP files and that if there was "any other" charge presented by the CP files, the Government would have been aware of it and was waiving it in the Agreement.  The PSR did not recommend any new charges, though it was obligated to do so, if there were any.   Second, the PSR contradicted Moynihan's assertion that she sent the CP files to NCMEC for an "identified victims" analysis.  The PSR led to a conclusion that that analysis had already been conducted. PSR ¶19: there was "only one known victim (living in Germany)."  In any event, the Government's actual knowledge is irrelevant.

More germane, the Government possessed all information necessary to investigate and, if appropriate, bring the production charge.  The Government: a) labeled the video CP; b) physically viewed it; c) possessed its GPS metadata; d) employed sophisticated software to analyze it; and e) admittedly was one of the files used to increase the guideline level.  Def.Br. 30.  The court held the Government was free to search the metadata once it labeled the video CP.  A.35.  To argue that these facts do not confirm that a production charge was "known to" the Government pursuant to the *Palladino* rule denies the obvious.

12

The Government's assertion that it could not search for GPS with its software is contradicted by Griffeye's website stating that it can perform GPS searches. Def.Br. 6.  McCullagh testified that, in 2018, HSI had the ability to search any individual CP file's GPS. Dkt. 53: 12/2/2020 Trans., p. 70.  After receiving NCMEC's 9/4/2019 email regarding the video's GPS, Moynihan emailed back "what were you guys using to be able to identify that this video had GPS data in it? I am trying to figure out why this wasn't found in our forensic exam." Dkt. 49: Ex. F at NCMEC 103.  The Government had the ability to examine this video's metadata.

In any event, Moynihan could have sent NCMEC the files prior to the Agreement or the Government could have disclosed it had not done so and reserved the right to do so.  Her assertion that she always sends CP files to NCMEC while her investigations are open and thought she had in this case, only to discover her mistake, *after* Defendant, pursuant to the Agreement, plead guilty and was sentenced, Dkt. 53: 12/2/2020 trans: 16, 54, brings two legal thoughts to the forefront:  First, even an innocent mistake by a prosecutor does not justify a breach of a plea agreement. *Santobello v. New York*, 404 U.S. 257, 260 (1971).  Second, is the Ninth Circuit's rejection of such a claim of mistake during plea negotiations:  "It is equally likely that the prosecution forewent additional legal research and investigation in order to secure a quick, favorable resolution of this case" and "[t]he Government had access to all the information necessary to conclude that Cuero's second conviction constituted a strike, and its failure to do so before entering the

plea agreement was exclusively the result of it own negligence at best or a calculated, though incorrect, decision at worst." *Cuero*, *supra*, 850 F.3d at 1022, ftnt. 3.

Citing the dictionary definition of "known," the court held that "known" means "actually known in the sense of recognized or appreciated." A.21. Had it applied the dictionary definitions of "relative to" and "any other" it would have been clear that a production charge premised on one of the CP files used to induce Defendant to plead guilty necessarily was in connection with his possession of that file. Consistent with the Government's "awesome advantages in bargaining power," *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999), courts have ***not*** applied the dictionary definition of "known" when interpreting plea agreements. Instead, the *Palladino* rule applies. Def.Br. 28-41.

*Elbit Sys. v. Credit Suisse Group*, 842 F.2d 733 (S.D.N.Y. 2012), the sole case cited by the court in support of its conclusion that, absent language such as "known or should have known," "known" means "recognized and appreciated," i.e., subjective knowledge, is clearly inapposite. Def.Br. 31. Civil contract interpretation rules have no relevance to the interpretation of federal plea agreements. This Court has repeatedly rejected the notion that plea agreements are interpreted by looking to commercial contract principles, let alone rules for construing *civil contracts*. Def.Br. 30-31 (citing cases). *Elbit* has been cited three times, all applying New York's rules of construction for civil contracts. While the court's holding is wholly unsupported,

14

the Ninth Circuit, in *United States v. Rodriguez-Garcia*, 497 F. App'x 766 (9th Cir. 2012) expressly rejected the court's position; "*that the government's lawyer failed to appreciate **subjectively** the significance of the information disclosed on [the] rap sheet is irrelevant," and that, **if the Government wanted to limit a plea agreement to matters of which it had subjective knowledge, it was obligated to disclose that**. Id.* at 767.  Def.Br. 31, 36.

The Government ignores Defendant's rebuttal of the court's assertion that Defendant's cases are distinguishable because they are sentence estimate ("*Pimental*") cases.  *Cuero* was expressly focused on the fact that it ***was a charge bargain, not a sentencing case***. *Cuero, supra*, 850 F.3d at 1020.  Defendant's cases all discuss and apply the rules for interpreting plea agreements in general.  None limited their interpretations of "known to the Government" to *Pimental* cases. Def.Br. 37-38 (setting forth additional facts confirming their holdings were not limited to *Pimental* cases)*.*  Defendant cited multiple cases confirming that the plea agreement rules of construction apply beyond *Pimental* cases. Def.Br. 38-39.

The court's rulings create a massive loophole to the rules of conduct dictating how the Government must conduct itself during plea agreements.  If sustained, they overrule *Palladino's* and *Wilson's* holdings of what "known to the Government" means in plea agreements.  "Known" will sub silentio mean "subjectively known." While plea agreements demand the Government act with high integrity and ultimate fairness, it will now be free to make no effort to "know" information in its

15

possession or, worse, ignore information it is aware of and later assert it did not have subjective knowledge of it.  Second Circuit courts will no longer look to the defendant's reasonable understanding of a plea agreement's terms unless there is a predicate showing that a term is ambiguous in its normal usage, irrespective of what the Government led defendant to understand the term meant. The law of this Circuit will contradict that of the Fourth and Ninth Circuits.  Neither the Government nor the court cited *any* opinion holding that "known to the Government" implicitly means *subjectively* known in plea agreements..

At a minimum,  the phrases "any other" and "relative to" and the failure to reveal "known" meant subjective knowledge constitute ambiguities which must be interpreted in Defendant's favor.

### IV.     *Defendant's due process rights were violated*.

The Government's brief also failed to address this issue.  Not only does violating a plea agreement violate due process, but due process requires that, to be valid, a defendant must be made sufficiently aware of its likely consequences. Def.Br.  41-44.

Defendant's position is straightforward.  *Nine pages* of the 2018 Affidavit heralded the Government's prowess at comprehensively searching digital devices/files. (Dkt 18-1: ¶¶34-42).  The Report (Dkt.18-9) stated that the Government had comprehensively searched all devices/files.  During the months of negotiations preceding the Agreement, the Government gave no indication it had not

completed its search of the devices/files. No prior statements were retracted. The Agreement did not contain a reservation of rights to continue to search any files, let those used to induce Defendant to plead guilty. It was the Government's responsibility to reserve such a right. Def.Br. 35-36 (cases).

Defendant understood the Agreement would terminate the case. **Def.Br. 40-41** (cases). It defies reality to conclude otherwise. Both the court and the Government understood this to be the case or, at a minimum, verified the reasonableness of Defendant's understanding. The Government's 6/30/2020 brief contained the caption "**RESOLUTION OF THE 2018 CASE**" Dkt. 29, p.6. The court found that ". . . **the 2018 federal criminal case was closed**. . ." when NCEMC was sent the files. *United States* v. *Johnson,* 2021 U.S. Dist. LEXIS 122802 at *8 (D. Vt. June 29, 2021). In combination, the Government's statements in the Affidavit and Report led to the reasonable understanding that, if there was "any other" potential offense in the CP files, the Government would have "known" of it and was waiving it. Those statements also led to the reasonable understanding that no further search of the CP files used to convict him would occur and certainly not for evidence of an offense beyond the warrant. Def.Br. 42. The Release also eliminated any reason to conduct such a search since *any potential charge referenced in the CP files would necessarily be in connection with ("relative to") his possession of those files,* and therefore barred. Defendant's reliance on the Release's terms was definitely reasonable. Unless reversed, the court's Orders eviscerate these understandings of

the consequences of the Agreement. *See Wilson*, *supra,* 920 F.3d at 165 (*the Government's conduct changed the defendant's "exposure so dramatically," he could not reasonably have understood this as a risk*).

The entry into the Agreement confirmed these understandings. As a guilty plea moots the facts and eliminates the court's Article III jurisdiction, there was every reason to conclude the case was terminated; any potential claims in the CP files were waived; and no further searches would occur. It also eliminated the viability of the warrant and the Government's ability to rely on it.. Def.Br. 59, ftnt. 5, *citing* Dkt. 18: DOM, pp. 26-28, discussing the effect of mootness, *inter alia*, on warrants and subpoenas.

Reiterating, neither the Government nor court cited any instance where the Government, following a plea agreement, searched or used files admittedly used to induce a defendant to plead guilty to bring a new charge, particularly one beyond the scope of the warrant used to seize the file *in a charge bargain case*. The closest Defendant came was *Cuero*, flatly rejecting the propriety of such an attempt.

In *Cuero,* prosecutors discovered, after the plea agreement, that information in their possession at the time of the plea agreement could be used to amend the complaint to add a new charge. *Cuero* held that doing so violated the defendant's due process rights, since "a charge bargain means that the prosecution will not later add charges or strikes, just as the defendant will not plead to less than the

agreed-upon charges and strikes." *Cuero*, *supra,* 850 F.3d at 1024.[2]  Def.Br. 34-36;

42-44.  The Government's conduct here was worse: only after Defendant pleaded

guilty, was sentenced and incarcerated for nine months did the Government bring a

new charge based on information already in its possession.  *Cuero* is directly on

point and, respectfully, should direct the outcome of this appeal.

## V.    *NCMEC acted as a Governmental Agent.  Requiring it to comply with the Constitution will have a limited effect on its activities.*

The record confirms NCMEC acted as a Governmental agent.  All facets of

CVIP, which encompasses CRIS, electronically searching submitted files for known

victims, is done at the request of, in combination with, and/or to assist

law-enforcement.  Dkt. 36;  Ex. 1, p. 2 (NCMEC publication so stating).  Both of its

dual missions are designed to assist law-enforcement. *Id.* All four of its activities are

undertaken to assist law-enforcement. *Id.*  In the first, submitted files are "run

through CRIS and/or visually reviewed by an analyst to determine whether if depicts

an identified child."  If CRIS does not identify the child in a file, the file is "closely"

examined, which may include "location" determination. *Id.*  Moynihan sent the files

for a CRIS analysis. Dkt. 29-8, ¶8;  Supp.A. 20 (submission form).  It is therefore

clear NCMEC functioned as a Governmental agent.  Additionally, a search by a

private person is a governmental search if the Government knew of the private

search and the private person intended to assist law enforcement.  Def.Br. 44-45.

---

[2] The court's assertion that *Cuero* was overruled by the Supreme Court is incorrect and contrary to its pronouncements. Def.Br. 43, ftnt. 2.

Moynihan made the CRIS request and CRIS is undertaken to assist law-enforcement.

Accepting Defendant's position will have a limited effect on NCMEC's activities. It only applies when NCMEC reviews files seized by the Government pursuant to a warrant not extending to production, which is the case here, and NCMEC nonetheless seeks to extract GPS for evidence of production. Then, NCMEC would call the submitting agent to inform him/her of the situation so that that person could, if appropriate, obtain a warrant.

NCMEC would remain free to "run" submitted files through CRIS. Here, only because CRIS did NOT produce an identification did NCMEC move to its second activity, examining the file for "location" information. NCMEC could unimpededly take all steps not involving a search for a file's GPS, such as facial recognition or analysis of things shown in the video.

## VI. *NCMEC's and Moynihan's searches for evidence outside the warrant's scope were unconstitutional.*

The Government's arguments are all based on a legally unsupported premise: information in metadata has no existence separate from the file it describes. Consequently, it argues, once the video was labeled CP, it was free to search the file's metadata for *any* evidence, even information which a) was not responsive to the warrant (Def.Br. 46-47); b) was not reviewed during the case, (Def.Br. 46-47); c) there was no probable cause to search (Def.Br. 46-47); d) was not identified in the

Rule 41 responsiveness review and therefore outside the warrant; (Def.Br. 15-16, 48-49); and e) was subject to a right to privacy which had not been waived or infringed (Def.Br. 61-62). Additionally, it claims the metadata information could be searched no matter how long after its seizure.

Its position is that labeling the video CP caused the video's metadata to morph into contraband, precluding a right to privacy for any contents, even contents having nothing to do with CP. McCullagh, however, testified there is nothing illegal about metadata (Def.Br. 50-51); it was not visible when looking at the video; and viewing it required a separate search using separate software. Def.Br. 45-46.

None of its cases address the question in this appeal: does metadata describing a file labeled contraband transform the file's metadata into contraband, rendering information in it incapable of being privacy protected and therefore free to be searched for any purpose, including for evidence of a crime beyond the warrant used to seize the file and which is subject to an undisturbed constitutional privacy right? Instead, they stand for a proposition not in issue: there is no privacy right in contraband. See *United States v. Chambers*, 192 F.3d 374 (3d Cir. 1999) (motion for return of contraband properly denied); *Illinois v. Andreas*, 463 U.S. 765, 771 (1983) (focused solely on the marijuana), Def.Br. 51-52 (distinguishing *Andreas*); *United States v. Jacobsen*, 466 U.S. 109 (1984) (focusing on the white powder). *Jacobsen's* pronouncement that: "governmental conduct that can reveal whether a substance is cocaine, **and no other arguably `private' fact,** compromises no legitimate privacy

interest," *Id.* at 123 (emphasis added), establishes that the Government was *not* entitled to look for the GPS as its search was done to discover privacy protected information which was not waived. (Def.Br. 46-47, 60-61).

*United States v. Ganias*, 824 F.3d 199, 213 (2d Cir. 2016) found digital files may be fragmented and stored in multiple locations, not that metadata is indistinguishable from the file it describes. To the contrary, *Ganias* states that, "as a *corollary* to this fragmentation, the computer stores unseen information **about** any given "file,'" including metadata. *Id.* (emphasis added). Metadata is not the same as the file, but rather contains information "about" the file. *Ganias* states that, notwithstanding fragmentation, it is still necessary to "segregate responsive data from non-responsive data." The Report did not designate GPS/metadata as responsive. (Dkt. 20, Ex. 9). *Ganias* further stated: "[forensic examiners] may seek *responsive* metadata. . . ." *Id.* at 214. The Government's search protocols had nothing to do with where a video was recorded. (Dkt. 29, pp. 5-6). As McCullagh testified, the purpose of searching GPS is to determine who produced it. Def.Br. 46 (DKT 53: Tr. 95). The warrant did not extend to evidence of production. *Ganias*, *supra* at 213-14. The metadata/GPS was not responsive to the warrant. NCMEC's search was warrantless and unconstitutional.

*Carpenter v. United States*, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018) confirms that metadata has a separate existence. (Def.Br. 45, 54-55). Defendant does not argue *Carpenter* means there is a permanent expectation of privacy in GPS,

Govt.Br. 22,  just that the Government needs an applicable warrant to search for it.

NCMEC did not simply reperform the Government's search. Govt.Br. 18. NCMEC did not confine itself to a review of images, but rather searched the metadata for evidence of production, a crime beyond the warrant. The GPS evidence had not been searched (Def.Br. 46-47) and remained privacy protected. (Def.Br. 61). *Dispositively, the Government now admits it had no reason or probable cause to search for the GPS*:  "**Lacking reason to review such [location] data** associated with any specific video or image, agents identified files as CSAM without noting the production location of each file." Govt.Br. 5,  and  "**Absent probable cause** to believe the lawfully seized CSAM contained evidence of further crimes—a likely situation where law enforcement, **as in this case**, had no evidence of hands-on abuse at the time of the initial investigation—**law enforcement would not be able to obtain a warrant to share its seized images with NCMEC**." *Id.* 27, ftnt. 7 (emphasis added).  *See* Def.Br. 46-47 (facts confirming no probable cause).  The Government cannot sidestep a warrant's limitations by passing files off to NCMEC for a search outside the warrant's scope. Def.Br. 50.

The Government argues that NCMEC was merely attempting to identify a new child victim.  At the time of its search, it was attempting to extract the "location" information and, as required by CVIP, forward that information on to Moynihan for possible legal action.  The only way to potentially identify the child was to match the video's and Defendant's GPS coordinates to attempt to show the

child may be his. Only then could the child possibly be identified. Def.Br. 47 (facts confirming). While NCMEC's assistance of law-enforcement in child abuse cases is laudable, its searches must still be constitutional.

The Government's repeated claim that the warrant could be read broadly enough to encompass GPS/metadata information does not mean it was seized within the scope of the warrant, which was limited to evidence of possession/distribution. That determination is the function of the responsiveness review. While Government feigns ignorance about how a report created after the warrant's service could define what was properly seized, Fed.R.Crim.Pro. 41 dictates that, while the Government may overseize information pursuant to a digital warrant, a responsiveness review must be conducted within a reasonable time to determine what evidence was properly seized pursuant to the warrant. Def.Br. 48-49.

The Report summarized that responsiveness review. Dkt 18-9; Dkt. 47, 13-14. (Moynihan: Report summarizes that analysis). While the video was labeled responsive, *neither metadata nor GPS were. Id.*, *passim*. The Report focused entirely on evidence related to possession or distribution, not where a video was recorded. Dkt.18-9. As now admitted, there was no reason or probable cause to search for GPS.

Even if metadata is viewed as part of the video file, *United States v. Nejad*, 436 F. Supp. 3d 707 (S.D.N.Y. 2020) confirms that parts of a file or document can be responsive, while others are not, i.e., files are not monolithic. "Documents not

identified as responsive at the conclusion of [the responsiveness] review 'f[e]ll with[out] the scope of the warrant[s]' and thus were not seized pursuant to them." *Nejad, supra,* 436 F.Supp. at 736 (quoting Fed.R.Crim.P. 41 Committee Notes (2009)).  Upon completion of the review, the warrant was fully executed and a subsequent search of information not deemed responsive violates the Fourth Amendment.  *Id.* ("Because these searches were conducted following the conclusion of the responsiveness review - *and thus the execution of the warrants* - they exceeded the scope of the warrants' authority.") (emphasis added).  This is true even if the subsequent search reveals information responsive to the warrant but not held to be so prior to the completion of the responsiveness review, i.e., the warrant's execution.  *Id.*

   *Nejad* suppressed 429 pages of the 2,978 pages the Government intended to rely on because they were first identified after the responsiveness review.  *Id*. at 737. In words appropo to the GPS information, *Nejad* stated:

> These pages include attachments for which the parent email or a related parent email was identified by April 2017; pages for which a related version or related version and attachment were identified by April 2017; a parent email for which the attachment was identified by April 2017; and other portions of documents identified by April 2017.

*Id.* (citations omitted).  *Nejad* makes clear that portions of a document or file may be deemed seized pursuant to a warrant, while other portions of the same document or file are not properly seized unless identified as such in the responsiveness review. As the GPS/metadata was not identified in the Report, even if considered part of the

file, that portion must be suppressed. As *Nejad* held:

> the issue here is not one of segregation of documents within the scope of the warrants from those without but rather one of whether these pages were identified as falling within the scope of the warrants during the responsiveness review to begin with. Because the Government cannot demonstrate that these 429 individual pages were identified as responsive at the conclusion of the responsiveness review, their subsequent identification exceeded the scope of the warrants and they must be suppressed.

*Id.* As the Government now admits it had no reason or probable cause to search for GPS, NCMEC's and Moynihan's searches through the unresponsive GPS/metadata after the execution of the warrant was complete were warrantless and unconstitutional.

The Government's postcard analogy is inapplicable. Contrary to turning a postcard over, the metadata was not visible when viewing the video and required a separate search using separate software to view it. The GPS was sought to bring a charge beyond the scope of the warrant used to seize the file, confirming the need for a new warrant to search for it. Unlike the postcard sender, the GPS was privacy protected. Neither GPS nor metadata were responsive to the warrant, rendering the search unconstitutional since it was done after the review's completion and the GPS had a constitutional right of privacy which had never been infringed upon.

Finally, NCMEC and Moynihan's searches were monumentally untimely and not reasonable as required by the Fourth Amendment. Def.Br. 57-60. The Government discussed none of the facts confirming this extreme untimeliness. It argued that because it only sent files with no right to privacy, no time limit could

apply to NCMEC's review.  Govt. Br. 18, ftnt 6.  The Government ignores that after the initial seizure, the GPS/metadata was deemed to have been seized outside the scope of the warrant and that even properly seized evidence must be reviewed in a reasonable, timely, fashion. Def.Br. 57-60.

The facts also confirm that Moynihan conducted her own warrantless search. NCMEC did not send the video, only the GPS coordinates extracted from the metadata and a crop from it.  While the facts then in her possession may well have provided her with probable cause to do so, Moynihan chose not to seek a warrant to search for evidence of production.  Instead, using the metadata information in NCMEC's email she instructed her team to search for the video so they could watch it together.  Dkt. 53: Tr., p.21.  That search was also warrantless and constitutionally untimely.

Dated at South Hero, Vermont, this 12th day of October 2022.

Respectfully Submitted,

*Dennis J. Johnson, Esq.*

Dennis J. Johnson, Esq.
Bar # 4238
479 West Shore Road
South Hero, VT 05486
(802) 233-2007

Francis J. Twarog, Esq.
ERN: 7354
Catamount Law, PLLC
2 Church St., Ste. 4G
Burlington, VT 05401
(802) 864-9811

27

## CERTIFICATE OF COMPLIANCE

1. This document complies with Local R. App. P. 32.1(a)(4) and Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 7,000 words or less.  The number of words was documented by Google Docs, the word-processing program used in typing and assembling the brief.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionally spaced typeface using New Times Roman 14 point throughout.  Except for headings; footnotes; and quotations, the text is double spaced between lines and paragraphs.

*Dennis J. Johnson, Esq.*
Dennis J. Johnson, Esq.
Law Offices of Dennis J. Johnson, Esq.
479 West Shore Road
South Hero, VT 05486
(802) 233-2007
Attorney for Cory M.  Johnson, Appellant/Defendant
Dated:  October 12, 2022.

28